UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KRISTIN KLEIN-CAMPO,

        Plaintiff,

vs.                                     Case No.  3:06-cv-420-J-32MCR

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,[1]

        Defendant.
_____/

## REPORT AND RECOMMENDATION[2]

      This cause is before the Court on Plaintiff's appeal of an administrative decision

denying her application for Social Security benefits.  The Court has reviewed the record,

the briefs, and the applicable law.  For the reasons set forth herein, it is recommended

the Commissioner's decision be **AFFIRMED**.

## I.    PROCEDURAL HISTORY

      Plaintiff protectively filed an application for a Period of Disability and Disability

Insurance Benefits ("DIB") on January 13, 1998 and again on April 20, 1998, alleging an

inability to work since February 26, 1996.  (Tr. 42, 121, 158).  The Social Security

Administration ("SSA") denied the application initially and upon reconsideration.  (Tr. 42,

---

[1]  Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration.  See Rule 25(d)(1), Fed.R.Civ.P.

[2]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

56-61).  Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ") on October 26, 1999 but failed to appear at the hearing.  (Tr. 62-65).  The hearing was rescheduled for January 13, 2000.  (Tr. 68).

On April 4, 2000, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 39-41).  On May 25, 2000, Plaintiff filed a Request for Review by the Appeals Council.  (Tr. 71).  On October 24, 2003, the Appeals Council vacated the hearing decision and remanded the case to the ALJ.  (Tr. 73-76).  Another hearing was scheduled for February 6, 2004 (Tr. 81, 100) and then for October 1, 2004 (Tr. 109).  On September 21, 2005, the ALJ issued a second decision finding Plaintiff not disabled.  (Tr. 16-32).  On October 13, 2005, Plaintiff filed another Request for Review by the Appeals Council.  (Tr.15).  The Appeals Council denied Plaintiff's Request for Review on March 10, 2006, thus making the ALJ's September 21, 2005 decision the final decision of the Commissioner.  (Tr. 8-10).  Plaintiff timely filed her Complaint in the U.S. District Court on May 9, 2006.  (Doc. 1).

## II.   NATURE OF DISABILITY CLAIM

### A.   Basis of Claimed Disability

Plaintiff claims to be disabled since February 26, 1996, due to chronic/progressive multiple sclerosis ("MS") with lesions on brain and spinal column, neurological dysfunction, double vision, severe headaches, chronic pain, disorientation, memory loss, weakness, bladder infections, stress, mood swings, numbness, muscle wasting, weight loss, hypoglycemia, hypothyroidism, and urinary incontinence.  (Tr. 42, 158).

**B.**   **Summary of Evidence Before the ALJ**

Plaintiff was 46 years of age on the date of the hearing.  (Tr. 30).  She has a high

school diploma and two and one-half years of college.  (Tr. 43, 161, 489).  Plaintiff has

past relevant work experience as an insurance agent, a home health care worker, an

admissions representative, a receptionist, and a clerk.  (Tr. 43, 161).

Plaintiff's medical history is highlighted in the ALJ's decision and therefore, will

not be repeated in full here.  However, by way of summary, the record indicates Plaintiff

started seeking medical treatment as early as 1994 when she visited the office of Dr.

Ulises M. Caraballo.  (Tr. 336).  The lab reports ordered by Dr. Caraballo in June and

July 1994, August 1995, and January 1996 were generally normal.  (Tr. 317-18, 320-22,

330, 332, 334, 336-37).  Dr. Caraballo's impressions included back pain and migraines

in 1995 and MS in 1996.  (Tr. 316, 323, 326).

In a February 7, 1996 letter to Dr. Caraballo, Dr. William H. Noran expressed his

view that Plaintiff should undergo a magnetic resonance imaging ("MRI") of the brain

and noted his impression of diplopia (double vision).  (Tr. 207).  Subsequent to

performing the MRI of the brain on February 26, 1996, Dr. Noran noted the results were

"most consistent with Multiple Sclerosis" and Plaintiff's Visual Evoked Response test

"showed a 7.2 MS delay on the left all compatible with M.S."  (Tr. 203, 342).

Based on the results of the MRI, Dr. James S. Bomhard, Plaintiff's treating

physician, diagnosed Plaintiff with MS in March 1996 (Tr. 280) and has been treating

her with medication since then (Tr. 249-51, 253-55, 358).  Although Dr. Bomhard's

Progress Notes from 1996 through 2002 reveal a diagnosis of MS (Tr. 247, 252, 256,

265, 358, 380-81), they show it is based on a limited amount and complexity of data (Tr.

247, 252, 256, 259, 265, 269, 382) and/or a low overall risk (Tr. 248, 259, 265, 269, 344, 382), except the Progress Notes from March 2001 that show a moderate amount and complexity of data and a moderate overall risk (Tr. 381).

The lab reports ordered by Dr. Bomhard in 1996 were generally normal, showing a few out-of-range levels in categories, such as protein, phosphorus, lipid, lymph, and hematology.  (Tr. 272, 274-75, 278).  In addition to MS, in 2000, Dr. Bomhard diagnosed Plaintiff with migraine headaches (Tr. 358) and noted they were consistent with MS (Tr. 360).  According to Dr. Bomhard, other symptoms consistent with MS included Plaintiff's fatigue, vision problems, pain, depression, poor short-term memory, and disorientation.  (Tr. 359, 361-62).

For the period of 1997-2002, Plaintiff also sought treatment at Shands at Starke, at AGH, and at the University of Florida.  (Tr. 219-20, 352, 368, 363).  In February 1998, for instance, an emergency record showed Plaintiff complained of weakness, and her examination revealed the neurological system was alert, normal, and with diffuse weakness.  (Tr. 215-16).  Plaintiff was later diagnosed with MS and weakness (Tr. 216, 352) and tested for a sleep disorder (Tr. 363-66).  In 2002, the sleep tests revealed Plaintiff did not have "any definitive sleep disorder," but only "an elevation of her arousal index" and "some sleep fragmentation."  (Tr. 363-64).

In July 1998, Dr. Dennis D. Dewey, Dr. Keith Holden, and Dr. Robert B. David submitted their evaluations of Plaintiff.  Dr. Dewey noted Plaintiff's double vision in her left eye and the absence of acute distress.  (Tr. 225).  He stated Plaintiff "has long standing recurring headaches that are generally unilateral, associated with nausea, photophobia, sonophobia and sometimes preceded by a visual aura [that] sound [like]

4

very typical migraine type headaches." Id. Dr. Dewey remarked the tests showed normal hand coordination, normal grip strength, and normal strength in the upper and lower limbs. (Tr. 226). He found no objective abnormalities on Plaintiff's neurological exam. Id.

Dr. Dewey's observations were confirmed in April 2004, when he reported again that Plaintiff's neurological examination was essentially normal. (Tr. 455). He noted objective testing showed no abnormalities despite Plaintiff's complaints of decreased sensation in her feet. (Tr. 454). Dr. Dewey observed Plaintiff's subjective reports of pain and fatigue were consistent with MS. (Tr. 455). Basing his conclusions on Plaintiff's complaints of weakness and pain in the neck and shoulders, Dr. Dewey stated Plaintiff could lift or carry up to ten pounds both occasionally and frequently, and stand or walk for six hours in an eight-hour workday. (Tr. 457-58).

In July 1998, Dr. Keith Holden completed a physical Residual Functional Capacity ("RFC) assessment that revealed a diagnosis of MS. (Tr. 230). He noted Plaintiff could lift or carry up to fifty pounds occasionally and up to twenty-five pounds frequently, and stand, walk, or sit for six hours in an eight-hour workday. (Tr. 231). These conclusions were also confirmed in February 1999 when a second physical RFC assessment was completed by a non-treating, non-examining physician. (Tr. 296-303).

The only other limitations noted in Dr. Holden's assessment included occasional balancing (Tr. 232), avoiding moderate exposure to extreme heat, and avoiding concentrated exposure to hazards (Tr. 234). Dr. Holden acknowledged that Plaintiff's complaints of chronic pain, headaches, heat intolerance, and double vision "could be due to MS." (Tr. 235). Similar to Dr. Dewey, however, Dr. Holden noted the

5

examination showed no objective abnormalities (Tr. 232) and revealed Plaintiff was "quite functional" as she could cook, clean, and do the laundry (Tr. 235).

In July 1998, Dr. David completed a personality evaluation, after which he concluded Plaintiff had a mood disorder related to a physical disability.  (Tr. 228).  He noted Plaintiff's "disturbances in neuro-vegetative functioning while perhaps reflecting M.S., may also reflect a mood disorder" and "were consistent with a mood disorder." (Tr. 228-29).  Dr. David observed Plaintiff's memory was intact, her mood somewhat agitated, her affect normal, and her energy level very low.  (Tr. 228).  As to Plaintiff's sleep disturbances, he observed both insomnia and hypersomnia by turns.  Id.

A month later, Dr. Vergara completed a Psychiatric Review Technique ("PRT") form noting no severe impairments and no functional limitations to satisfy the listings. (Tr. 238, 245).  He observed slight difficulties in maintaining social functioning and seldom deficiencies of persistence or pace.  (Tr. 245).  Dr. Vergara, like Dr. David, concluded Plaintiff had a mood disorder due to physical problems.  (Tr. 241).  These conclusions were confirmed in May 1999 when another PRT form was completed by a non-treating, non-examining physician who added Plaintiff was slightly restricted in activities of daily living.  (Tr. 282-89).

In June 1999, Dr. Nidal Sakka conducted a physical examination of Plaintiff and listed the following impressions: MS, recurrent migraine headaches, chronic depression, bladder spasms, arthritis, and hypothyroidism.  (Tr. 291-92).  He noted there was "no evidence of any significant neurological deficit on neutral exam," "no evidence of any major limitation in the range of motion of any of her joints, and no evidence of advanced arthritis on physical examination."  Id.  Plaintiff was "in no acute distress," had no major

6

motor or sensory deficit, had normal grip strength, no muscle wasting, and "no reproducible fatigue by repetative muscle testing." Id.

Subsequently, in October 1999, Dr. Sakka completed a physical assessment showing Plaintiff was able to lift up to 20 pounds continuously and 21-100 pounds frequently; to carry up to 50 pounds continuously and 51-100 pounds frequently; to sit, stand, or walk without limitation; to use both hands continuously; and to climb, balance, stoop, crouch, kneel, and crawl continuously. (Tr. 310-12).

A year later, based on the available information, Dr. Efrain D. Salgado concluded he was "not able to make a diagnosis of multiple sclerosis." (Tr. 372). In 2001, he stated the diagnosis of MS was supported by "limited confirmatory laboratory evidence" and the more recent MRI of the brain was consistent with demyelinating disease. (Tr. 369). Dr. Salgado explained that even if Plaintiff had MS, most of her complaints might result from something else and further extensive testing was necessary. (Tr. 370). While fatigue and heat intolerance were associated with MS, he asserted that fatigue, pain, and tender points were also associated with fibromyalgia. Id. The record shows no further testing was performed to rule out fibromyalgia. (Tr. 375).

In November 2001, Dr. Infante diagnosed Plaintiff with depression, post-traumatic stress disorder ("PTSD"), MS, and hypoglycemia. (Tr. 415). In February 2003, she was diagnosed with depression and sinusitis. (Tr. 418). In June 2004, Plaintiff was again diagnosed with depression as well as MS and chronic pain. (Tr. 469). Throughout 2002 and 2004, her lab reports showed a few out-of-range levels in categories, such as hemoglobin, basophils, chloride, carbon dioxide, and cholesterol. (Tr. 386, 388, 476).

7

On June 24, 2004, Dr. Louis Legum reflected Plaintiff's affect was restricted, mood dysphoric, thought process integrated, memory intact, judgment and insight minimal, and intelligence average.  (Tr. 463).  He noted Plaintiff had some symptoms of a pervasive personality disorder (Tr. 464), but his impressions included pain disorder associated with psychological factors, histrionic personality disorder, MS, and a GAF[3] of 50-55.  (Tr. 465).  Dr. Legum stated Plaintiff had slight limitations in her ability to carry out detailed instructions, moderate limitations in interacting appropriately with the public, supervisors, and coworkers, and moderate limitations in responding appropriately to work pressures and changes in a routine work setting.  (Tr. 466-67).

During the ALJ hearings, Plaintiff testified she could not work an eight-hour day because of her vision problems (Tr. 489, 569-70), sleepiness, fatigue, not being "steady on her feet" (Tr. 494), numbness in her feet (Tr. 494, 510), pain in her hips, neck, back, shoulders, sinuses, and head which she described as 8 on a scale of 1 to 10 (Tr. 495, 499, 580), confusion, disorientation (Tr. 498, 587), mood swings (Tr. 502), dizziness (Tr. 508), bladder problems (Tr. 509, 582), slow pace (Tr. 512), and tardiness (Tr. 596). She testified her sleepiness, pain, and fatigue occur daily and her sleepiness came unexpectedly, even while driving.  (Tr. 572-73, 579).  Plaintiff also claimed she had symptoms of depression (Tr. 598-99) and high blood pressure (Tr. 601).

---

[3] The Global Assessment of Functioning ("GAF") Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 32 (4th ed. 1994).  A GAF score of 51-60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers).  Id.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR serious impairment in social or occupational functioning (such as, having no friends or being unable to keep a job).  Id.

Plaintiff admitted she did not take her pain medication at work (Tr. 495) and would take an over-the-counter drug before taking a prescription drug (Tr. 501).  Even when Plaintiff did take a prescription pain medication, she took less than the prescribed dosage because she was afraid of getting addicted, could not afford it, and could not "really function if [she was] on that kind of stuff."  (Tr. 500).  Plaintiff further stated she relieved her daily headaches with prescription drugs, meditation or hypnosis, and over-the-counter Advil.  (Tr. 506-07).  She also claimed the prescribed injections for MS were not working and that she had injection site reactions as a result of them.  (Tr. 590).

Plaintiff also admitted her pain and sleepiness were relieved with marijuana which her boyfriend blew in her face.  (Tr. 519-20).  At first, Plaintiff denied using marijuana (Tr. 518), but then admitted she had used it a few times (Tr. 520).  At a different hearing, Plaintiff testified she had tried marijuana a couple of times as it helped relieve her discomfort.  (Tr. 607).  Later, however, Plaintiff stated she actually used it once a month and kept some "joints" her ex-husband had given her for times when she "really, really needed it."  (Tr. 608).  Plaintiff explained other discrepancies between her testimony and her statements to physicians by the need to underreport her problems. (Tr. 515).  Further, Plaintiff clarified she had not visited the physician who first diagnosed her with MS because she was in denial about having MS.  (Tr. 516).

In regards to her daily activities, Plaintiff testified she washed the dishes twice a week, made the bed (Tr. 588), and walked down to her mailbox (approximately 110 yards) (Tr. 594).  She stated she was able to walk her thirteen-acre property daily until approximately November 1999 and she tried to do it again in January 2000, but could not cover the whole area.  (Tr. 595).  She testified that someone came over to feed her

9

animals (Tr. 588) including twenty cats, four or five dogs, two ducks, one goose, and one rooster (Tr. 608).  Plaintiff claimed she could only drive seven miles (Tr. 492) and when she needed to drive further in order to get her medication, she needed to take medication to keep her awake (Tr. 606).

### C.    Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when she is unable to engage in a substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve (12) months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).

Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146

(1987).

In the instant case, the ALJ determined Plaintiff met the nondisability requirements of the Social Security Act and was insured for benefits up through June 30, 2004. (Tr. 20, 31). Therefore, Plaintiff had to establish disability on or prior to June 30, 2004. (Tr. 20). At step one, the ALJ found Plaintiff's "work activity, although not at or above the presumptive levels for substantial gainful activity most months, can be indicative of her functional ability to work." (Tr. 21). The ALJ found Plaintiff could not be found disabled for the period of August and September of 2001 and January and May of 2002 due to her participation in a substantial gainful activity. (Tr. 21, 31). Nevertheless, the ALJ analyzed Plaintiff's disability claim "for all other periods from the claimant's alleged onset date through the date of this decision." (Tr. 21).

At steps two and three, the ALJ stated:

> The medical evidence supports a finding that the claimant has a history of multiple sclerosis, history of migraine headaches, history of hypertension, history of hypothyroidism, history of dysthymic disorder, history of post traumatic stress disorder, and history of pain disorder associated with psychological factors, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

(Tr. 22, 31). In regards to Plaintiff's residual functional capacity ("RFC"), the ALJ found Plaintiff was:

> able to sit without limitation and stand and walk a total of up to 6 hours in an 8-hour workday. She has the ability occasionally and frequently to lift and carry up to 10 pounds. She has no limitation in her ability to push and pull with her upper or lower extremities. She has no postural, manipulative, visual, or communicative limitations. She is not able to work in hazardous environments such [as] around moving machinery

11

> or unprotected heights. She has slight limitation in her ability
> to carry out detailed instructions. She has moderate limitation
> in her ability to interact appropriately with the public,
> supervisors, and coworkers or respond appropriately to work
> pressures in a usual work setting or to changes in a routine
> work setting.

Id. The ALJ further determined Plaintiff "would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, or pace." (Tr. 27). The ALJ found Plaintiff's testimony regarding "her impairments and their impact on her ability to work . . . not entirely credible in light of the few objective findings and the claimant's limitation of work by choice." (Tr. 22, 29, 31).

At step four, the ALJ utilized the testimony of a vocational expert ("VE") who stated Plaintiff could not perform her past relevant work. (Tr. 29, 31). Accordingly, the ALJ proceeded to step five where, utilizing the VE's testimony again, he determined that based on Plaintiff's "age, educational background, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (Tr. 30-32). Therefore, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 31-32).

**III.    ANALYSIS**

   **A.    The Standard of Review**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson

v. Perales, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as a finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560.  Accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (explaining the court must scrutinize the entire record to determine reasonableness of factual findings).

### B.    Issues on Appeal

The Plaintiff argues two issues on appeal.  First, Plaintiff claims the ALJ erred by discounting the opinion of Plaintiff's treating physician, Dr. Bomhard.  Second, Plaintiff argues the ALJ improperly discounted Plaintiff's subjective complaints of pain and other subjective symptoms.  The Court will address both these claims.

### 1.  Whether the ALJ erred by discounting the opinion of Plaintiff's treating physician.

Plaintiff asserts the ALJ erred by rejecting the opinion of Plaintiff's treating physician, Dr. Bomhard, which she claims was supported by the medical evidence of record and was consistent with Dr. Noran's opinion.  (Doc. 12).  The Commissioner responds the ALJ considered Dr. Bomhard's opinion, but decided to give greater weight to Dr. Dewey's opinion because Dr. Dewey was a licensed neurologist and because Dr. Bomhard's opinions were conclusory, not supported by enough medical and laboratory findings, and inconsistent with the other evidence in the record.  (Doc. 13).

The ALJ is required to consider all of the evidence in the claimant's record when making a disability determination.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  In addition, the ALJ must state the weight afforded to the evidence considered.  Ryan v. Heckler, 762 F.2d 939, 941 (11th Cir. 1985).  Specifically, the ALJ "should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence."  Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990).

The ALJ should generally give more weight to a treating physician's opinion than to a consulting physician's opinion.  Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984) (citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981)); Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996).  However, "the ALJ has the discretion to weigh objective medical evidence and may choose to reject the opinion of a treating physician while accepting the opinion of a consulting physician" when the ALJ can demonstrate "good cause" for

14

his or her decision. Gholston v. Barnhart, 347 F. Supp. 2d 1108, 1114 (M.D. Ala. 2003); see also Wilson, 734 F.2d at 518 (stating "the ALJ may reject a treating doctor's opinion when it is contrary to the evidence . . . and [a]n acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled," rather, "[i]t must be supported by clinical or laboratory findings").   Moreover, it may be unreasonable to reject a consulting physician's opinion in favor of a treating physician's opinion where the treating physician may not even be competent to diagnose what a consulting physician was able to diagnose due to his or her specialty. Haag v. Barnhart, 333 F. Supp. 2d 1210, 1219 (N.D. Ala. 2004).  Accordingly, the opinion of a specialist is given more weight than the opinion of a non-specialist on "issues related to his or her area of specialty."  King v. Barnhart, 320 F. Supp. 2d 1227, 1231-32 (N.D. Ala. 2004), citing 20 C.F.R. § 404.1527(d)(5); see also Gholston, 347 F. Supp. 2d at 1114-15 (holding the ALJ properly rejected the treating physician's opinion and relied on the consulting physician's opinion who was a specialist); Haag, 333 F. Supp. 2d at 1220, 1220 n.6 & n.7 (finding the consultative physician's opinion was entitled to more weight because it was more thorough and she was a specialist).

In the instant case, the ALJ considered the opinion of Dr. Bomhard, but gave it less weight.  (Tr. 26).  Although a treating physician's opinion is generally given more weight, here, the ALJ had "good cause" for giving less weight to Dr. Bomhard's opinion and more weight to the opinions of Dr. Dewey and Dr. Sakka.  See Gholston, 347 F. Supp. 2d at 1114.  First, Dr. Bomhard's opinion merely stated a diagnosis of MS without showing what, if any, functional limitations resulted from the impairment and whether they were sufficient to prevent Plaintiff from performing any type of work.  Next, Dr.

15

Bomhard based his diagnosis solely on the MRI of the brain performed on February 26,

1996 and did not perform further tests – moreover, he specifically noted in the Progress

Notes that his diagnosis was based on a limited amount and complexity of data and that

it presented a low overall risk.  (Tr. 247, 252, 256, 265, 280, 358, 380-81).  Indeed,

another physician, Dr. Salgado, also stated the diagnosis of MS was supported by

"limited confirmatory laboratory evidence" and he could not agree with the diagnosis.

(Tr. 369, 372).

Although the MRI indicated the results were "most consistent with Multiple

Sclerosis" (Tr. 203, 342),  the record indicates Plaintiff's symptoms could also be

indicative of other diseases, such as fibromyalgia, demyelinating disease, or mood

disorder (Tr. 228-29, 369-70).  Fibromyalgia, in particular, was never ruled out as

Plaintiff was never evaluated by a rheumatologist.  (Tr. 375).  Rheumatologists are

generally considered "better qualified to determine the effects of fibromyalgia because

not all doctors are trained to recognize this disorder."  Bruet v. Barnhart, 313 F. Supp.

2d 1338, 1346 (M.D. Fla. 2004); Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1336

(M.D. Fla. 2003).

Furthermore, the laboratory results ordered by various physicians, including Dr.

Bomhard, between 1994 and 2004 were generally normal.  (Tr. 272, 274-75, 278, 317-

18, 320-22, 330, 332, 334, 336-37, 386, 388, 476).  In addition, despite Plaintiff's

constant complaints of sleepiness, the testing performed at Shands showed no

definitive sleep disorder, but just some sleep fragmentation.  (Tr. 363-64).  Several

physicians, including Dr. Dewey, noted Plaintiff was not in acute distress and there were

no objective abnormalities on her neurological exam.  (Tr. 225-26, 455).  On the

contrary, the tests showed normal hand coordination, normal grip strength (Tr. 226), normal range of motion of the joints, no evidence of advanced arthritis, and no muscle wasting (Tr. 291-92).

Even though Dr. Noran and Dr. Bomhard noted the results of the MRI of the brain were consistent with MS, the attending physicians at Shands and Dr. Holden diagnosed Plaintiff with MS, and Dr. Dewey observed Plaintiff's subjective reports of pain and fatigue were consistent with MS; the ALJ properly concluded that mere diagnosis is insufficient in the absence of significant functional limitations resulting from the impairment.  Here, the two separate physical RFC assessments significantly overlap in their conclusions and show minor limitations on Plaintiff's ability to work.  Dr. Holden, in particular, stated Plaintiff was "quite functional" as she was able to cook, clean, and do the laundry.  (Tr. 235).  In addition, Dr. Vergara's PRT form also noted Plaintiff had no functional limitations to satisfy the listings.  (Tr. 238, 245).  These conclusions were supported by the second PRT form which showed slight restrictions in activities of daily living.  (Tr. 282-89).  Dr. Sakka's physical assessment also confirmed that Plaintiff's limitations were not significant.  (Tr. 310-12).

Finally, the ALJ did not err by giving less weight to the opinion of Dr. Bomhard who was a family physician and by giving more weight to the opinion of Dr. Dewey who was a neurologist and as such, was better qualified to evaluate neurological conditions, such as MS.  See King, 320 F. Supp. 2d at 1231-32 (stating the opinion of a specialist is given more weight than the opinion of a non-specialist on "issues related to his or her area of specialty"); Gholston, 347 F. Supp. 2d at 1114-15 (holding the ALJ properly rejected the treating physician's opinion and relied on the consulting physician's opinion

17

who was a specialist).  Accordingly, the undersigned finds no error in the ALJ's decision

to give less weight to the opinion of Plaintiff's treating physician, Dr. Bomhard.

## 2. Whether the ALJ properly discounted Plaintiff's subjective complaints of pain under the Eleventh Circuit's pain standard.

Plaintiff takes the position the ALJ failed to properly apply the Eleventh Circuit's

three-prong pain standard and failed to give adequate reasons for discrediting Plaintiff's

subjective complaints of pain.  (Doc. 12).  The Commissioner concedes the ALJ did not

expressly cite to the pain standard, but asserts the ALJ was not required to do that as

long as the ALJ applied the correct legal standard.  (Doc. 13).  The Commissioner also

asserts the ALJ gave adequate reasons for discrediting Plaintiff's allegations of pain.  Id.


Pain is a non-exertional impairment.  Foote, 67 F.3d at 1559.  The ALJ must

consider all of a claimant's statements about her symptoms, including pain, and

determine the extent to which the symptoms can reasonably be accepted as consistent

with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the

medical signs and laboratory findings show medical impairments which reasonably

could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying
> medical condition and either (2) objective medical evidence
> that confirms the severity of the alleged pain arising from
> that condition or (3) that the objectively determined medical
> condition is of such a severity that it can be reasonably
> expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

Even if "the ALJ does not cite or refer to the language of the three-part test," the pain

18

standard is properly addressed when the ALJ's "findings and discussions indicate that the standard was applied."  Wilson v. Barnhart, 284 F.3d 1219, 1225-26 (11th Cir. 2002).

Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability, 42 U.S.C. § 423(d)(5)(A).  Once a claimant establishes through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce pain, 20 C.F.R. sections 404.1529 and 416.929 provide that the Commissioner must consider evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms in deciding the issue of disability.  Foote, 67 F.3d at 1561; see also SSR 96-7P (stating that after the ALJ finds a medically-determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities").  When a plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7P.

In the instant case, the Court concludes the ALJ's findings and discussions indicate the ALJ applied the Eleventh Circuit's three-part pain standard, even though he did not specifically mention it.  The ALJ found Plaintiff had impairments that are severe, even though not severe enough to satisfy the listing in Appendix 1, Subpart P,

19

Regulations No. 4.  (Tr. 22).  This finding and the ALJ's later discussions of the nature,

severity, and resulting limitations of Plaintiff's impairments show the ALJ's implicit

conclusion that the objective medical evidence establishes the existence of an

underlying medical condition which, in itself, meets prong one of the pain standard.

Without this implicit conclusion, the ALJ had no reason to evaluate Plaintiff's credibility.

The fact that the ALJ proceeded to evaluate Plaintiff's credibility also shows the

ALJ's other implicit conclusion that Plaintiff's statements as to the intensity, persistence,

or limiting effects of her alleged symptoms were not supported by the objective medical

evidence.  Moreover, the ALJ expressly referred to 20 C.F.R. § 404.1529, which adds

additional support to the conclusion that the ALJ properly applied the pain standard.

See Wilson, 284 F.3d at 1226 (stating it was clear the ALJ applied the pain standard

when the ALJ cited to 20 C.F.R. § 404.1529, because it "contains the same language

regarding the subjective pain testimony that this Court interpreted when initially

establishing its three-part pain standard").

Accordingly, the ALJ was required to consider Plaintiff's subjective complaints of

pain and other symptoms.  See Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988)

(stating that in determining whether the pain standard is met, the credibility of Plaintiff's

testimony must be considered).  The ALJ did so and found her testimony to be not

entirely credible.  (Tr. 29).  When an ALJ decides not to credit a claimant's testimony

about pain, the ALJ must articulate specific and adequate reasons for doing so, or the

record must be obvious as to the credibility finding.  Jones v. Dep't of Health & Human

Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (stating articulated reasons must be based

on substantial evidence); see also Moore v. Barnhart, 405 F.3d 1208, 1212 n.4 (11th

Cir. 2005) (holding precedent in the Eleventh Circuit requires "explicit articulation of the reasons justifying a decision to discredit a claimant's subjective pain testimony").  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

Additionally, the Code of Federal Regulations sets forth seven factors that an ALJ should consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications used to alleviate pain or other symptoms; (5) treatment other than medication, received for relief of pain or other symptoms; (6) any measures, other than treatment, used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7P.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.

Here, the ALJ examined some of these factors and provided several reasons for his determination regarding Plaintiff's credibility.[4]  First, the ALJ found Plaintiff's

---

[4] Although the ALJ does not discuss each of the seven factors, this is not error as the Eleventh Circuit does not require discussion of all seven factors explicitly.  See French v. Massanari, 152 F. Supp. 2d 1329, 1338, n.6 (M.D. Fla. 2001) (holding that "it is not reversible error that the administrative law judge did not expressly mention the side effects of [the plaintiff's] medications in his credibility determination"); Bechtold v. Massanari, 152 F. Supp. 2d 1340, 1349, n.9 (M.D. Fla. 2001), aff'd, 31 Fed. Appx. 202 (11th Cir. 2001) ("In the Eleventh Circuit, there is no requirement that all seven of these factors be discussed explicitly.").

credibility was weakened by the fact that she had been working since 2000 and at the time of the ALJ's second hearing despite her alleged pain.  (Tr. 29).  Next, the ALJ noted Plaintiff had engaged in activities that a totally disabled person would not be able to do: taking care of her young daughter and walking her thirteen-acre property on a daily basis until two months before the hearing.  Id.  The ALJ also found Plaintiff's allegations regarding the severity of her symptoms and limitations were further undermined by her testimony "that she performed household chores once every three days, did the dishes, and cooked meals in the microwave."  Id.

Next, the ALJ noted Plaintiff's infrequent visits to Dr. Bomhard's office and the emergency room due to the expense.  Id.  In addition, the ALJ noted Plaintiff's testimony was not supported by the medical evidence, especially that of Dr. Dewey and Dr. Sakka.  Id.  The ALJ also discredited Plaintiff's subjective complaints based on her statements regarding using marijuana and her inconsistent statements regarding the care of her animals.  Id.

Plaintiff primarily takes issue with the ALJ's reliance on Plaintiff's ability to take care of her young daughter and his reference to Plaintiff's failure to frequently visit Dr. Bomhard or the emergency room.  (Doc. 12, p.15).  Specifically, Plaintiff states that it was error for the ALJ to base his credibility assessment on Plaintiff's taking care of her daughter and cites to several cases to support this proposition.  Had the ALJ simply based his credibility decision on Plaintiff's taking care of her daughter, the undersigned might agree.  However, the ALJ pointed to other daily activities which tended to be inconsistent with Plaintiff's allegations regarding her pain and limitations.  Indeed, walking her thirteen-acre property on a daily basis for just two hours was inconsistent

with a total disability, especially when the medical evidence of record shows lack of

significant functional limitations.  Dr. Dewey's report, for instance, showed Plaintiff could

stand or walk for six hours in an eight-hour workday and lift or carry up to ten pounds

occasionally and frequently.  (Tr. 457-58).  Two physical RFC assessments also

revealed Plaintiff could stand, walk, or sit for six hours in an eight-hour workday.  (Tr.

231, 296-303).  Dr. Sakka's report identified no limitations in Plaintiff's ability to sit,

stand, or walk.  (Tr. 310-12).  Plaintiff's own testimony also established she could walk

the 110-yards distance to her mailbox.  (Tr. 594).  Moreover, the record also supports

the ALJ's conclusion as to Plaintiff's other daily activities, such as cooking, washing the

dishes, and cleaning.  (Tr. 235, 588).  Accordingly, the Court finds no error in the ALJ's

consideration of Plaintiff's daily activities in making his credibility assessment.

Plaintiff also claims it was error for the ALJ to base his credibility determination

on her failure to obtain treatment because she could not afford the treatment.  To

support this argument, Plaintiff points to the case <u>Dawkins v. Bowen</u>, in which the

Eleventh Circuit held that failure to follow prescribed medical treatment does not

preclude a finding that a claimant is disabled when the failure is justified by a lack of

funds.  <u>Dawkins v. Bowen</u>, 848 F.2d 1211, 1213 (11th Cir. 1988).  While Plaintiff is

correct that a lack of funds will excuse a failure to obtain medical treatment, this was not

the only reason the ALJ cited for discrediting Plaintiff's credibility.  The other reasons

cited by the ALJ are supported by the record and therefore, any such error does not

warrant a reversal.

First, as the ALJ noted, the record shows Plaintiff was working after her alleged

onset date of February 26, 1999.  (Tr. 152).  Plaintiff's earnings in August, September,

23

and November of 2001 and January and May of 2002 (Id.) were sufficient to preclude

disability benefits regardless of the severity of the impairments because the earnings

constituted substantial gainful activity (Tr. 20-21, citing 20 C.F.R. §§ 404.1574(b),

416.974(b) (revised, 2005)).  The fact that Plaintiff engaged in substantial gainful activity

during these periods undermines her credibility as to the severity and limiting effects of

her symptoms.

The ALJ also pointed to the inconsistent statements Plaintiff made regarding

taking care of her animals, which included twenty-three cats, five dogs, a horse, two

ducks, one goose and a rooster.  (Tr. 228, 569, 608).  During the hearings, Plaintiff

testified that someone helped her feed the animals.  (Tr. 588).  During her doctor's

visits, however, she reported to Dr. David that taking care of the animals consumed a lot

of her time.  (Tr. 228).[5]

In sum, the undersigned finds that the ALJ properly considered Plaintiff's

subjective complaints, but rejected them as not credible to the degree alleged and

articulated explicit reasons for his decision to discount them.  Accordingly, the Court will

not disturb the ALJ's findings.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds the ALJ's decision is supported

by substantial evidence and is based upon the proper legal standards.  Accordingly, it is

---

[5] Additionally, allthough the ALJ did not mention Plaintiff's inconsistent statements regarding her marijuana usage in his credibility assessment, he did make a note of it in the decision.  (Tr. 27).  Plaintiff's accounts on her marijuana usage varied.  At one time, Plaintiff denied using marijuana (Tr. 518), but then, she testified she only used it passively when her boyfriend blew it in her face (Tr. 519-20).  Finally, she admitted using it a few times and even keeping some joints from her ex-husband for times when she really needed it (Tr. 608).

hereby

**RECOMMENDED**:

The Commissioner's decision be **AFFIRMED**.


**DONE AND ENTERED** at Jacksonville, Florida, this __12th__ day of June, 2007.




_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record
The Honorable Timothy J. Corrigan,
     United States District Judge